Starrett v. Brosseau.

Henrietta H. Starrett v. Noel Brosseau, Executor.

1, Attorney and Client—*Law Does Not Prohibit an Attorney from Dealing with His Clients.*—The law does not prohibit an attorney, agent or trustee, from dealing with his clients, principal or *cestui que trust;* such contracts, if open, fair and honest, when deliberately made, are as valid as contracts made between other parties.

2. Appellate Court Practice—*Assignments of Error Not Argued Are Waived.*—Assignments of error not argued in this court are considered as waived.

Appeal from Probate.—Appeal from the Circuit Court of Kankakee County; the Hon. John Small, Judge presiding. Heard in this court at the April term, 1903. Affirmed. Opinion filed October 8, 1903.

J. Starrett, attorney for appellant.

H. K. & H. H. Wheeler, attorneys for appellee.

Mr. Justice Vickers delivered the opinion of the court. George V. Huling died testate on December 23, 1894,

leaving an estate estimated at $780,000, but which on final settlement proved to be $760,546.70.

Truman and Milo C. Huling, brothers of decedent, were made executors of the will; the former resided at Kankakee, and had been the partner of decedent in the loan business for a long period of time. Milo C. resided at Bennington, Vt.

By the will the widow was to receive $180,000 in personal property and the homestead. Five thousand dollars to the Ladies' Library, $5,000 to the Episcopal Church and $2,000 to the Cemetery Association were all of the specific bequests made, and the residue of the estate was bequeathed to ten of his nephews and nieces, share and share alike. The widow elected to take under the will and was paid in full within a few days after the executors qualified. The estate consisted largely of notes, stocks and bonds, a small amount of cash on hand and about $67,000 in real estate. The legatees all being adults, the settlement of the estate was made amicably between themselves without the direction of the County Court. No inventory was filed of the personal estate.

With the consent of the legatees, there was a distribution in kind and there was an allotment to each of the ten residuary legatees of notes, bonds, stocks and cash of $50,209. The personal assets were divided by the executors into ten lots and one awarded to each of the ten residuary legatees. This distribution was made and the amount delivered to the several legatees.

At the suggestion of Truman Huling, the legatees left their securities in his hands for collection, the proceeds being by him collected and remitted to the legatees from time to time. In order to meet the convenience of the legatees' requests for cash payments and also with a view of extending leniency to the clients, Truman Huling advanced large sums of cash to the legatees, and took notes in his hands to reimburse himself. Within less than four months after the death of his brother there had been paid in cash to the legatees above $95,000, a portion of which

had been collected, but a large amount had been furnished by Truman Huling. In making the distribution to Mrs. H. H. Starrett, one of the legatees, it was discovered that a mistake had been made and she was charged with the receipt of four notes aggregating about $5,000. These notes are known as the Erzinger notes and the Fortin note. These notes were listed in a book by Truman Huling and the book delivered to her as a memorandum of the notes left for collection with Truman Huling. In her correspondence and dealings with her uncle she referred to this book containing a copy of the notes supposed to belong to her. In an inquiry made respecting her affairs she referred to the Erzinger and Fortin notes. This brought the matter to the attention of Truman Huling who immediately requested her to forward him a copy of her book of notes, saying, under date of March 28, 1899, " My copy book of your notes does not enumerate all the notes you claim, neither do I find all the notes you mention in the package of notes left with me for collection." Much concern was manifested by Truman Huling about the discrepancy in Mrs. Starrett's allotment, and he set about trying to locate the mistake. Much correspondence followed but no very clear and satisfactory explanation could be found, but certain it was, a mistake had been made, and Mrs. Starrett was the sufferer thereby.

Truman Huling took his books and papers, went to Chicago and had a personal interview with the claimant, but what took place we can not know, since Truman Huling is dead and Mrs. Starrett is not competent to testify. But that such interview took place, is shown by the correspondence. Under date May 16, 1899, Truman Huling in a letter to claimant says:

" However, if nothing happens I will call on you next week and will have my book and papers, that you may see for yourself just how the matter stands."

Again, in a letter May 31, 1899, to claimant, he says:

" I am some better than when I last wrote and will endeavor to call at your house at 10 o'clock Thursday of

this week. I am anxious to have you see all the papers in my possession."

Under date June 14, 1899, he says:

"This copy book and envelope are the same that I exhibited to you when last in Chicago."

Further on in the same letter he says:

"I never knew until within a few weeks, that your copy book did not agree with mine. I immediately called brother Milo's attention to that matter and requested him (inasmuch as he had full copies of all books and papers) to point out where the mistake had occurred and by whose carelessness it was made, as I informed you when last in Chicago."

So that it is reasonably certain that the claimant had at least one interview in person with Truman Huling, at which the subject-matter of this mistake was talked about. There were nine notes of $2,000 each in the hands of Truman Huling belonging to nine legatees, known as the Maltman notes. All the balance of the estate appears to have been settled and disbursed to the legatees. In order to equalize Mrs. Starrett with the other legatees, it was proposed by Truman Huling that each of nine legatees, including Mrs. Starrett, contribute $600 out of the Maltman notes to make up the deficiency. This was agreed to. E. C. Huling, one of the legatees, had been settled with in full and did not contribute anything. This arrangement was satisfactory to all the parties and the claimant herein executed receipts in full after she received the proceeds of the contribution of the legatees. In this contribution Mrs. Starrett reduced her Maltman note $600. She files a claim against the estate of Truman Huling for this $600 and for interest accrued on the Erzinger notes and on the $600, of $791.35, making a total of $1,391.35. The County Court refused to allow the claim and an appeal to the Circuit Court resulted in the same way and the claimant has prosecuted a further appeal to this court, and assigns numerous errors, of which we will consider, first, whether the finding of the court in refusing to allow the claim is against the law and the evidence. It is admitted that there was a shortage in the

amount paid the claimant, and that this mistake was afterward discovered and the same was corrected by calling on the legatees to contribute *pro rata,* except E. C. Huling, an amount sufficient to make up the shortage. It is now contended that this settlement is not binding on claimant and that she is entitled to recover, notwithstanding the settlement. It is undoubtedly true, that whether the relation of Truman Huling and the claimant be regarded as executor and legatee, or as principal and agent, the relation is fiduciary, and any settlements or contracts made by the former with the latter respecting the subject-matter of the trust must be fair and honest and free from fraud to be binding when repudiated by the *cestui que trust.* But the law does not prohibit an attorney, agent or trustee from dealing with his clients, principal or *cestui que trust;* such contracts, if open, fair and honest, when deliberately made, are as valid as contracts made between other parties. Herr v. Payson, 157 Ill. 244, and cases there cited.

Why could not Truman Huling settle with the claimant for the shortage in her legacy? It was his duty to settle with her if any error had been made in his previous settlements. But it is said he concealed from her the fact that he claimed the Erzinger and Fortin notes as his own property to reimburse himself for cash advanced to the legatees before any distribution was made. There is no proof of such concealment; on the contrary when we remember that Truman Huling, at his own suggestion made an appointment with claimant in Chicago; that he took his book and papers with him in order to let the claimant see just how the matter stood; that they had a talk about this matter of the Erzinger and Fortin notes, and that afterward the claimant voluntarily made a full and final settlement of the whole matter and receipted the decedent in full for the alleged shortage, and then acquiesced in said settlement for two years and a half, and until Truman Huling had died, we are constrained to hold that such settlement is binding and that there is no inference or suspicion of fraud or concealment attached to the transaction. The matter of this

alleged mistake was a source of anxiety to Truman Huling, as is evidenced by his numerous letters to the claimant and his persistent efforts to have it settled and made satisfactory. We entertain no doubt whatever that throughout these entire and voluminous transactions of Truman Huling with his nephews and nieces he was actuated by an honest purpose to faithfully discharge the trust that had been reposed in him by his deceased brother.

Truman Huling was a man of wealth and advanced in years; he had no children and it was supposed by the claimant and other legatees of George V. Huling that Truman had made a will similar to the one his brother had made, and it is suggested by Milo Huling in his evidence that this expectation caused the legatees to acquiesce in the settlement. It is altogether possible that if their hopes kept them quiet, that their disappointment may have caused them to break their silence after the contents of Truman's will were made known. While the claim is not barred, yet it is a circumstance worthy of notice that the final settlement was made with the claimant in September, 1899, and this claim was exhibited for the first time, April 8, 1902. No valid reason is shown why action should not have been taken sooner. We think the court did not err in finding against the claimant, and that the assignments of error now under consideration are not sustained.

It is also assigned as error that the court erred in admitting improper evidence, and in refusing to admit proper evidence offered by appellee, and that the court erred in refusing to hold some and modifying other propositions of law submitted by appellant to be held as law of the case but in the ninety-seven pages of brief filed by appellant in this court not one word is said about any of these assignments of error. They are therefore waived. Rhodes v. Rhodes, 172 Ill. 187; Harding v. The People, 202 Ill. 122.

The judgment of the Circuit Court is affirmed.